1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                              DISTRICT OF OREGON

10                            PORTLAND DIVISION

11  SEAL SOURCE, INC.,                    )
                                          )
12               Plaintiff,               )      03:09-cv-00875-HU
                                          )
13      vs.                               )      FINDINGS AND
                                          )      RECOMMENDATION
14  CESAR CALDERON; DULIA CASTRO;         )
    HYDRAULICS SUPPLY INTERNATIONAL       )
15  CORP.,                                )
                                          )
16                                        )
                 Defendants.              )
17      _____

18
    Ronald G. Guerra
19  Jordan Schrader, P.C.
    Two Centrepointe Drive, 6th Floor
20  Lake Oswego, OR 97035
    ron.guerra@jordanschrader.com
21
         Attorney for Plaintiff
22

23  Roger A. Hennagin
    Roger A. Hennagin, P.C.
24  8 North State Street, Suite 300
    Lake Oswego, Oregon 97034
25  roger@hennagin-lawyers.com

26       Attorneys for Defendant

27

28

    FINDINGS AND RECOMMENDATION        1

HUBEL, Magistrate Judge:

## Introduction

Currently before the court is defendant Cesar Calderon's ("Calderon") motion [75] for summary judgment, plaintiff Seal Source, Inc.'s ("Plaintiff") motion [90] to strike Calderon's reply in support of his motion for summary judgment, and Plaintiff's motion [93] to strike the declaration of Calderon's counsel, Roger Hennigan, in response to Plaintiff's sur-reply.  Calderon seeks entry of an order granting summary judgment and dismissing Plaintiff's pending claims for relief against him with prejudice. For the reasons that follow, Calderon's motion for summary judgment should be GRANTED in part and DENIED in part.

## Background[1]

The case at bar arises under The Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  (FAC ¶ 2.)  Plaintiff is a supplier of hydraulic and replacement seal kits throughout the United States and Latin America.  (FAC ¶ 7.)  Calderon was employed by Plaintiff from January 24, 2006, through July 8, 2009, when he was terminated. Calderon served as Plaintiff's Spanish Customer Service Representative, and was responsible for marketing and sales of Plaintiff's products throughout Latin America.  (FAC ¶ 9.) Calderon was the only Spanish Customer Service Representative employed by Plaintiff, which gave him access and knowledge of Plaintiff's customer lists, customer contact information, customer proprietary information, vendor lists, supply lists, seal kit

---

[1] Unless otherwise indicated, the following facts are taken from Plaintiff's First Amended Complaint ("FAC") (doc. #46).

FINDINGS AND RECOMMENDATION    2

1 | recipes, marketing strategies, negotiating strategies, pricing
2 | information, and other confidential and secret company information
3 | relating to its markets, such as Latin America. (FAC ¶ 10.)

4 | On July 22, 2009, Jorge A. Ordinola ("Ordinola"), as the
5 | incorporator, filed electronic Articles of Incorporation for
6 | Hydraulic Supply International Corporation ("HSIC"), with the
7 | Florida Department of State Division of Corporations. (FAC ¶ 11.)
8 | HSIC's filing bears Documents No. 09000062294, and became effective
9 | July 23, 2009. (FAC ¶ 11.) The HSIC Articles of Incorporation
10 | name Calderon as president. (FAC ¶ 12.)

11 | Plaintiff's first claim for relief is based on a violation of
12 | the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. (FAC ¶¶ 14-18.)
13 | Plaintiff alleges that Calderon was involved in designing and
14 | implementing a scheme intended to access one or more of Plaintiff's
15 | protected computers to wrongfully obtain information. (FAC ¶ 15.)
16 | Plaintiff's second claim for relief is based on misappropriation of
17 | trade secrets in violations of ORS 646.461, *et. seq.* (FAC ¶¶ 19-
18 | 25.) Plaintiff claims that Calderon accumulated and disclosed its
19 | trade secrets for the purposes of entering into a competing
20 | business, which violated Plaintiff's written policies. (FAC ¶ 20.)

21 | Next, Plaintiff brings a claim based on intentional
22 | interference with its economic relations. (FAC ¶¶ 26-29.)
23 | Plaintiff claims that Calderon has acquired and disclosed trade
24 | secrets for the improper purpose of contacting Plaintiff's
25 | customers, vendors and suppliers all in an effort to establish a
26 | competing business. (FAC ¶ 28.) Plaintiff's fourth claim for
27 | relief is based on the alleged conversion of Plaintiff's customer
28 | lists, customer contact information, customer proprietary

FINDINGS AND RECOMMENDATION     3

information, vendor lists, supply lists, seal kit recipes, marketing strategies, negotiating strategies, pricing information, and other confidential and secret company information relating to markets, including the Latin American markets. (FAC ¶ 31.) Lastly, Plaintiff brings a claim for an alleged breach of a confidential and fiduciary relationship. (FAC ¶¶ 33-35.) Plaintiff claims that Calderon owed them an implied and express duty to keep the aforementioned company materials confidential and not to reveal them to the other defendants in this case. (FAC ¶ 34.)

Based on these claims, Plaintiff seeks monetary damages, punitive damages in the amount of $500,000, a permanent injunction prohibiting further disclosure and use of their confidential information, and an order requiring the return of such information. (FAC at 6.)

### Procedural History

Plaintiff filed this action on July 29, 2009, naming Calderon, Seal Supply Peru SA, Dulia Castro ("Castro"), Casdel HNOS SA, and John Does 1 through 10 as defendants. (Doc. #1.) Calderon, Castro, and Casdel HNOS SA were served on July 29, 2009. (Doc. #5.)

Roger Hennagin appeared on behalf of Calderon on August 4, 2009 (doc. #15) and filed a motion to dismiss for lack of jurisdiction on his behalf. (Doc. #16.) On August 27, 2009, Judge Redden denied the motion to dismiss. (Doc. #28.) Meanwhile, a show cause hearing was set before Judge Redden on September 3, 2009. (Doc. #29). The hearing was stricken due to the parties submitting a stipulated order for preliminary injunction. (Doc. #31.) Under the terms of that order, the defendants were to return

FINDINGS AND RECOMMENDATION     4

to Plaintiff all proprietary and/or trade secret information, and Plaintiff was required to post a bond in the amount of $10,000. (Doc. #33.)

On December 15, 2009, the court held a Rule 16 conference. (Doc. #37.)  Plaintiff was ordered to serve the complaint and summons on the defendants that failed to appear, no later than January 15, 2010.  Calderon was to file his answer no later than January 19, 2010.  The Rule 16 was continued until January 19, 2010, with the parties being notified that the court would dismiss any defendants not yet served, and would set a full case schedule. (Doc. #37.)  On January 15, 2010, Plaintiff decided to voluntarily dismiss Seal Supply Peru SA, Casdel HNOS SA, and Castro from the case.  (Doc. #40.)

In a status report filed with the court on February 8, 2010, Plaintiff indicated that they had located a United States address for Castro, and a company that Calderon and Castro appeared to be operating out of Florida, and that it would amend the complaint to reallege Castro and HSIC's participation in the conduct alleged. (Doc. #45.)  The FAC was filed on February 12, 2010, naming Caderon, Castro, and HSIC as defendants. (Doc. #46.)  Summons were issued to HSIC and Castro.  Calderon filed an answer to the FAC on February 26, 2010.  (Doc. #47.)  An affidavit of service upon Castro, showing substituted service by mailing was filed April 28, 2010.  (Doc. #49.)

On April 28, 2010, Plaintiff filed a motion for entry of default against Castro and HSIC. (Doc. #51.)  The court entered an order of default against Castro and HSIC on May 12, 2010.  (Doc. #54.)  On May 18, 2010, Roger Hennagin made a special appearance on

FINDINGS AND RECOMMENDATION      5

behalf of Castro (doc. #55) and, on the same day, Castro filed a motion to quash service of summons on her. (Doc. #56.) On July 15, 2010, this court issued a Findings and Recommendation indicating that Castro's motion to quash service of summons should be granted. (Doc. #61.) On August 9, 2010, Judge Redden adopted this court's Findings and Recommendation. (Doc. #63.)

On January 21, 2011, Calderon filed a motion for summary judgment (doc. #75), which is currently before the court.

**Legal Standard**

**I.    Motion for Summary Judgment**

Summary judgment is appropriate "if pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is not proper if factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an

FINDINGS AND RECOMMENDATION      6

1  element essential to that party's case, and on which that party
2  will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

3      The court must view the evidence in the light most favorable
4  to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d
5  1278, 1284 (9th Cir. 1982).   All reasonable doubt as to the
6  existence of a genuine issue of fact should be resolved against the
7  moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).
8  Where different ultimate inferences may be drawn, summary judgment
9  is inappropriate. *Sankovick v. Life Ins. Co. of N. Am.*, 638 F.2d
10 136, 140 (9th Cir. 1981).

11     However, deference to the nonmoving party has limits.   The
12 nonmoving party must set forth "specific facts showing a genuine
13 issue for trial." FED. R. CIV. P. 56(e).   The "mere existence of
14 a scintilla of evidence in support of plaintiff's positions [is]
15 insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252
16 (1986).   Therefore, where "the record taken as a whole could not
17 lead a rational trier of fact to find for the nonmoving party,
18 there is no genuine issue for trial." *Matsushita Elec. Indus. Co.,*
19 *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal
20 quotation marks omitted).

21 **II.  Motion to Strike**

22     Federal Rule of Civil Procedure ("Rule") 12(f) provides that
23 "[t]he court may strike from a pleading an insufficient defense or
24 any redundant, immaterial, impertinent or scandalous matter" on
25 their own initiative or pursuant to a party's motion. FED. R. CIV.
26 P. 12(f).   Granting a motion to strike is within the discretion of
27 the district court. *See Fed. Sav. & Loan Ins. Corp. v. Gemini*
28 *Mgmt.*, 921 F.2d 241, 244 (9th Cir. 1990).   Motions to strike are

disfavored and should not be granted unless it "can be shown that no evidence in support of the allegation would be admissible." *Pease & Curren Ref., Inc. v. Spectrolab, Inc.*, 744 F. Supp. 945, 947 (C.D. Cal. 1990) (internal quotation marks omitted), *abrogated on other grounds by Stanton Rd. Ass'n v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir. 1993).

## Discussion

## I. Procedural Arguments

According to Calderon, each of Plaintiff's claims is based upon the premise that he misappropriated either trade secrets or confidential information. (Mot. Summ. J. (doc. #75) ¶ 1.) Calderon therefore argues that he is entitled to summary judgment based on the following reasons: (1) he did not misappropriate trade secrets or confidential information; (2) he did not take any information from Plaintiff's computers for his own use; (3) he did not accumulate Plaintiff's trade secrets or disclose them to other defendants as alleged in the second claim for relief; rather, he intended to and did initiate efforts to compete with Plaintiff by opening his own business; (4) he did not disclose Plaintiff's trade secrets or confidential information to anyone; (5) he did not employ, use, or convert Plaintiff's trade secrets or confidential information; (6) he did not breach any fiduciary duty or any duty that he owed to Plaintiff because he did not appropriate Plaintiff's trade secrets or confidential information and did not disclose them to the other defendants; (7) he has given Plaintiff access to all of his computer files other than price lists he obtained from Plaintiff's competitors and vendors after he was fired; (8) the only information that Plaintiff has obtained through

FINDINGS AND RECOMMENDATION      8

discovery demonstrates that he intended to compete with Plaintiff by engaging in a similar business enterprise, but only doing business in Latin America; and (9) Plaintiff is unable to produce any evidence to support its allegations of unlawful conduct. (Mot. Summ. J. (doc. #75) ¶¶ 2-10.)[2]

In response, Plaintiff points out that Calderon's motion is based entirely on blanket denials of the allegations against him. (Pl.'s Resp. (doc. #80) at 1.) Plaintiff predicted that Calderon's filing was merely "a ploy" to force them into showing its hand, and that Calderon would reply with more detailed evidence and/ or arguments. (Pl.'s Resp. (doc. #70) at 1.)

Plaintiff's prediction came to fruition when Calderon filed his reply brief which, for the first time, detailed the applicable standards of law and specific reasons why summary judgment should be granted in his favor. (Reply Supp. Summ. J. (doc. #83) at 1-12.) In his reply brief, Calderon claims that, other than the claim arising under the Computer Fraud and Abuse Act, all of the remaining four claims against him are based on misappropriation of trade secrets. (*Id.* at 2.) According to Calderon, "[P]laintiff has produced only inferences which are not sufficient to overcome

---

[2] In support of his motion for summary judgment, Calderon has submitted his own affidavit and an affidavit from his counsel, Roger Hennagin. (Aff. Cesar Calderon (doc. #77) ¶¶ 1-15; Aff. Roger Hennagin (doc. #78) ¶¶ 1-3.) These affidavits simply restate the aforementioned statements. Calderon has also submitted a Concise Statement of Material Facts, which states: "Calderon's motion for summary judgment is not based upon facts which can be included in a concise statement. Rather it is based entirely upon negatives. Calderon is submitting an affidavit that denies the crucial focal element of each of the claims for relief. The absence of a fact cannot be supported with fact." (Doc. #76.)

1    the direct, probative evidence . . . produc[ed] in his reply."

2    (*Id.*)  This statement evinces the fallacy of Calderon's position.

3         Generally, a party waives any argument raised for the first

4    time in a reply brief.  *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th

5    Cir. 2010); *see also Nguyen v. Saxon Mortg. Servs., Inc.*, No. CV-

6    10-353-HZ, at *3 (concluding that the court need not consider

7    arguments made for the first time in a motion for summary judgment

8    reply brief); *see also U.S. ex. rel. Meyer v. Horizon Health Corp.*,

9    565 F.3d 1195, 1199 n.1 (noting that a theory, first raised in a

10   reply brief, is deemed to be waived); *see also Jachetta v. U.S.*,---

11   F.3d ---, 2011 WL 3250450, at *11 (9th Cir. 2011) (noting that an

12   argument was waived because it was developed for the first time in

13   a reply brief); *see also Quan v. Computer Scis. Corp.* 623 F.3d 870,

14   878 n.4 (9th Cir. 2010) (same).

15        Here, Calderon's motion for summary judgment was riddled with

16   blanket denials of the allegations against him.  Calderon therefore

17   fell woefully short of meeting his burden of establishing the

18   absence of a genuine issue of material fact.  In addition, once

19   Calderon committed himself to this position, the court need not

20   address arguments raised for the first time in his reply brief.

21   There are potential exceptions to this rule when, for example, the

22   events giving rise to the arguments have not occurred at the time

23   of filing the opening brief.  *See Ursak Inc. v. Sierra Interagency*

24   *Black Bear Group*, 639 F.3d 949, 963 (9th Cir. 2011).  Such an

25   exception is not warranted in Calderon's case, however.

26   *///*

27   *///*

28   *///*

FINDINGS AND RECOMMENDATION    10

## II.  Calderon's Arguments on the Merits

Nevertheless, even assuming, *arguendo*, Calderon had not waived these arguments, the court would still recommend denial of Calderon's motion for summary judgment based on the following reasons.

### A.    The Computer Fraud and Abuse Act

The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 ("§ 1030"), "prohibits a number of different computer crimes, the majority of which involve accessing computers without authorization or in excess of authorization, and then taking specified forbidden actions, ranging from obtaining information to damaging a computer or computer data." *U.S. v. Nosal*, 642 F.3d 781, 785 (9th Cir. 2011) (quoting *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1131 (9th Cir. 2009)).  Section 1030(g) provides a private right of action under the CFAA.  *Id.* at 786.  In order to prevail, a private plaintiff must prove that the defendant violated one of the provisions of § 1030(a)(1)-(7).  *Brekka*, 581 F.3d at 1131.  For instance, subsection (a)(4) subjects to punishment anyone who

> knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period.

18 U.S.C. § 1030(a)(4).

Calderon focuses his arguments upon subsections (a)(2) and (a)(4).  Under subsection (a)(2), a successful action can be predicated on a showing that the defendant: "(1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that he (3) thereby obtained information (4)

FINDINGS AND RECOMMENDATION      11

from any protected computer . . . and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value." *Brekka*, 581 F.3d at 1132. Similarly, *Brekka* describes the requisite elements of a subsection (a)(4) violation as follows: "(1) access[ing] a 'protected computer,' (2) without authorization or exceeding such authorization that was granted, (3) 'knowingly' and with 'intent to defraud,' and thereby (4) 'further[ing] the intended fraud and obtain[ing] anything of value,' causing (5) a loss to one or more persons during any one-year period aggregating at least $5,000 in value." *Id*.

Calderon claims that, in order to prove a violation of § 1030, Plaintiff "must produce evidence that Calderon achieved access to [their] computers without authorization to do so." (Reply Supp. Summ. J. at 2.) This characterization of the law is incorrect. As indicated above, Plaintiff must demonstrate that Calderon acted without authorization or, alternatively, that he exceeded the scope of his authorization. The phrase "without authorization" only encompasses situations where the defendant has "no authorization to access a computer at all[.]" *Nosal*, 642 F.3d at 787. Conversely, under § 1030(e)(6), when an individual is allowed to use a computer for a certain purpose and goes beyond those limitations, they are considered to be someone who "exceeded authorized access" under the CFAA. *Id*. "[A]n employer's use restrictions define whether an employee 'exceeds authorized access[,]'" such as a computer use policy or written employment agreement. *Id.* These restrictions may be in regards to the employee's use of the computer or of the information contained in that computer. *Id.* at 789.

FINDINGS AND RECOMMENDATION    12

Here, Calderon signed a "Confidentiality Agreement" that provided, "[i]nformation that pertains to Seal Source Inc.'s business, including all nonpublic information concerning the Company, its vendors, and suppliers, is strictly confidential and must not be given to people who are not employed by Seal Source Inc." (Aff. Dennis Stock (doc. #80-1) Ex. 1 at 1-2.) Calderon was also required by Plaintiff to take the following precautionary measures to protect confidential information, such as trade secrets, customer lists and company financial information:

> 1. Discuss work matters only with other Seal Source Inc. employees who have a specific business reason to know or have access to such information.
> 2. Do not discuss work matters in public places.
> 3. Monitor and supervise visitors to Seal Source Inc. to insure that they do not have access to company information.
> 4. Destroy hard copies of documents containing confidential information that is not filed or archived; secure confidential information in desk drawers and cabinets at the end of every business day.
> 5. Secure confidential information in desk drawers and cabinets at the end of every business day.

(*Id.*) The Confidentiality Agreement culminated by emphasizing the importance of Calderon's cooperation due to Plaintiff's obligation to protect the security of their clients and their own confidential information. *Id.*

It is undisputed that Calderon was authorized to use a company computer during the course of his employment as Plaintiff's Spanish Customer Service Representative. The Confidentiality Agreement, while not explicitly entitled a computer use policy, clearly placed restrictions on the manner in which Calderon was permitted to use the computers. The issue is whether there is a genuine issue of material fact as to whether Calderon exceeded his authorized access.

FINDINGS AND RECOMMENDATION    13

1   Calderon claims the only evidence that supports Plaintiff's
2   position is the existence of their price list on his personal
3   laptop with a handwritten date of July 9 entered adjacent to it,
4   and that there is no evidence Plaintiff's computers were the source
5   of the price list.  (Reply Supp. Summ. J. at 2.)  According to
6   Calderon, the price list was sent to him by Marco Saavedra
7   ("Saavedra"), one of Plaintiff's customers.  (Supp. Aff. Cesar
8   Calderon (doc. #83-1) ¶¶ 18-19.)
9        The court finds that Plaintiff has presented sufficient
10  evidence to create a genuine issue whether Calderon exceeded his
11  authorized access.  Aside from the price list, there is other
12  evidence suggesting Calderon may have used Plaintiff's computer for
13  improper transmission of company information in direct violation of
14  the Confidentiality Agreement.  After being terminated, Plaintiff's
15  President, Dennis Stock ("Stock"), discovered Calderon accessing
16  Plaintiff's computer database for the purpose of deleting
17  documents.  (Aff. Dennis Stock ¶ 7.)  Calderon claims that he was
18  merely deleting e-mails and other personal files, including family
19  photos.  (Supp. Aff. Cesar Calderon ¶ 13.)  Suspicious of
20  Calderon's activities, Stock, along with Larry Brown ("Brown"),
21  Plaintiff's information technologies consultant, accessed the
22  company-owned computer regularly used by Calderon. (Pl.'s Resp. at
23  3; Aff. Dennis Stock ¶ 8.)  They allegedly discovered the following
24  information: that Calderon had reconfigured one of the function
25  keys to save data to disk files instead of operating as a "print
26  key" function, unlike all other company-owned computers; that
27  Calderon, Castro and others were in the process of initiating a new
28  business, which would be called Seal Supply Peru, SA; and that

FINDINGS AND RECOMMENDATION     14

Calderon had, without approval, accessed and shared proprietary and trade secret information with Castro, owner of Casdel HNOS SA, one of Plaintiff's distributors and customers in Peru. (Pl.'s Resp. at 3; Aff. Dennis Stock ¶ 8.)

In fact, in a June 15, 2009, e-mail exchange Calderon revealed to Castro the name of one of Plaintiff's Latin American customers, Metaltec, and identified another prospective client named EICO. (Pl.'s Resp. at 5; Aff. Trevor Wells (doc. #80-3) Ex. 3 at 1.) Calderon indicated that Metaltec would introduce themselves to Castro at a mining expo she was attending. (Aff. Trevor Wells. Ex. 4 at 1-2.) Calderon also discussed how EICO had requested quotes from Plaintiff on several occasions, but never purchased anything from them. (*Id.*) In a May 26, 2009 e-mail Calderon indicated that he had discussions about forming a partnership with Saavedra as well. (*Id.* Ex. 2 at 2.)

Calderon claims Saavedra e-mailed him the price list after being terminated; however, Calderon has presented no evidence concerning the manner in which Saavedra obtained the price list. Plaintiff's Operations Manager, Jeff Stock, was the only person authorized to approve requests for the Excel spread sheet to be sent to customers. (Aff. Dennis Stock. (doc. #81) ¶ 3.) Subsequent to entry of the temporary restraining order, the parties arranged for a forensic analysis of Calderon's personal computer. (Pl.'s Resp. at 6.) The analysis revealed that Calderon had Plaintiff's price list for all of their products saved on his computer, which identifies "confidential, general price increase by part number and new list price." (Aff. Dennis Stock. (doc. #81) ¶ 2.) A reasonable inference from this information is that it contradicts

FINDINGS AND RECOMMENDATION    15

1  the explanation Calderon gave for the presence of the price list on

2  his computer and creates an issue of fact.  Calderon proffers only

3  an unattested affidavit from Saavedra stating that he received the

4  price list from Plaintiff.[3]  (Aff. Marco Saavedra (doc. #83-3) ¶¶

5  5-9.)  However, there is nothing in the record demonstrating how

6  information got to Saavedra, nor has Jeff Stock indicated that he

7  approved provision of the information to Saavedra.

8      In short, viewing the evidence in the light most favorable to

9  the nonmoving party, Calderon has failed to demonstrate the absence

10  of a genuine issue of material fact regarding Plaintiff's § 1030

11  claim.

12      **B.   Misappropriation of Trade Secrets**

13      According to Calderon, the information he possessed and shared

14  did not constitute trade secrets nor was there any misappropriation

15  since Castro was previously personally acquainted with two of the

16  vendors, *i.e.*, Metaltec and EICO.  (Reply Supp. Summ. J. at 7.)

17  Calderon admits discussing a third vendor with Castro, Dichtomatik,

18  but claims he was discussing a line of business that was not

19  competitive with Plaintiff.  (*Id.*)

20      Oregon Revised Statute ("ORS") § 646.461(2) defines

21  "misappropriation" as:

22      (a) Acquisition of trade secrets of another person by a
    person who knows or has reason to know that the trade
23      secret was acquired by improper means;

24

25

---

26      [3] Saavedra's affidavit indicates that, "I, MARCO SAAVEDRA,

27  after being first duly sworn, do depose and state that . . ."
    (Aff. Marco Saavedra at 1.)  However, Saavedra's affidavit has not

28  been notarized.  (*Id.* at 2.)

FINDINGS AND RECOMMENDATION    16

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who used improper means to acquire knowledge of the trade secret;

(c) Disclosure or use of a trade secret of another without express or implied consent by a person who, before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; or

(d) Disclosure or use of a trade secret of another without express or implied consent by a person, who at the time of disclosure or use, knew or had reason to know that the knowledge of the trade was:

　　(A) Derived from or through a person who had utilized improper means to acquire it;

　　(B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

　　(C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

ORS 646.461(2)(a)-(d).

A "trade secret" means information, including a drawing, cost data, customer list, formula, pattern, compilation, program, device, method, technique or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

ORS 646.461(4). "Improper means" includes "breach or inducement of a breach of a duty to maintain secrecy . . . through electronic or other means." ORS 646.461(1).

Calderon relies solely upon the decision rendered in *IKON Office Solutions, Inc. v. Am. Office Prods., Inc.,* 178 F. Supp. 2d 1154 (D. Or. 2001). Although *IKON* involved an allegedly secret customer list, while this case involves allegedly secret vendors

FINDINGS AND RECOMMENDATION    17

1   and a price list, Calderon contends that the legal principles
2   underlying *IKON's* decision are equally applicable to this case.

3       In *IKON*, it was alleged that two sales representatives
4   improperly used stolen trade secrets in violation of
5   confidentiality agreements. *Id.* at 1159. Ikon had claimed that
6   the representatives' knowledge of the identity of its customers was
7   a trade secret. *Id.* at 1167. The court conceded that, "[a]
8   customer list can sometimes be a trade secret, *e.g.*, when the
9   employer has expended considerable time and money to pinpoint a
10  narrow segment of the population that is interested in this product
11  or service." *Id.* (citing *Morlife, Inc. v. Perry*, 56 Cal. App. 4th
12  1514 (1997)). However, *IKON* was not such a case because, "Eugene,
13  Oregon, is a comparatively small market. A person with a
14  rudimentary knowledge of the industry, the Yellow Pages, and
15  business data publicly available from sources such as the Chambers
16  of Commerce can quickly identify the principal consumers of copying
17  equipment in that region." *Id.* at 1168.

18      The court agrees that *IKON's* underlying principles are
19  instructive; however, *IKON* can also be distinguished from the case
20  at bar. In *IKON*, the plaintiff sold, leased, and serviced office
21  machines, such as copiers. *IKON*, 178 F. Supp. 2d. at 1158. The
22  alleged trade secrets related only to their business in the small
23  geographic market of Eugene, Oregon. *Id.* at 1168. Here, unlike
24  *IKON*, Plaintiff supplies a far more unique and specialized product,
25  *i.e.*, hydraulic seals and replacement seal kits versus copy
26  machines. Plaintiff essentially fills a niche for the
27  construction, manufacturing, marine, mining and wood products
28  industries. Moreover, unlike *IKON*, rudimentary knowledge of the

FINDINGS AND RECOMMENDATION    18

industry and publicly available sources would not disclose the information at issue. Plaintiff appears to have gone to great lengths to protect confidential information, for example, its price lists could not be disclosed without approval from Plaintiff's Operations Manager. Lastly, *IKON* deals with a relatively small market, that is, Eugene, Oregon while this case deals with Latin America. These markets are not similar. Eugene and a copier customer base are both small and easily developed. Latin America covers more than a continent, including several countries speaking more than one language. The product involved is one for which it is significantly more difficult to identify customers than it is for office copiers. Developing a Latin American customer base clearly presented Plaintiff with several unique hurdles to overcome, as demonstrated by the necessity of hiring Calderon as a Spanish Customer Service Representative, who was responsible for marketing and sales of their product throughout Latin America. Calderon acknowledges that he was assigned the responsibility of developing business in this market by indicating that Plaintiff's President knows about business in America, but not how business in Latin America works. (Aff. Trevor Wells (doc. #80-3) Ex. 1 at 3.) Calderon also stated that he was the one with knowledge of international business and that Plaintiff depended on him. (*Id.*)

Accordingly, *IKON* does not suggest Calderon's motion should be granted, but rather suggests questions of fact preclude summary judgment here.[4]

---

[4] *IKON* was distinguished on similar grounds by *Ikon Office Solutions, Inc. v. Rezente*, No. CIV. 2:10-1704 WBS KJM, 2010 WL 5129293, at *2 n.1 (E.D. Cal. Dec. 9, 2010). *Rezente* noted that,

FINDINGS AND RECOMMENDATION     19

The definition of "trade secret" was recently discussed by Judge Schuman of the Oregon Court of Appeals in *Kaib's Roving R.PH. Agency, Inc. v. Smith*, 237 Or. App. 96 (2010).  Information that consists entirely of publicly available material that is reorganized and repackaged can, at times, qualify as a "trade secret." *Id.* at 102.  "When someone expends considerable time, effort, and expense to compile information, that information in its compiled form can, in some circumstances, meet the statutory definition of a trade secret." *Id.* at 102-03 (citing *Buffets, Inc. v. Klinke*, 73 F.3d 965, 968 (9th Cir. 1996) ("[t]rade secrets frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets")).  A trade secret is an elusive concept to define and it requires an ad hoc evaluation of the historical facts and surrounding circumstances. *Id.* at 103. Such circumstances include: whether the information at issue is generally known within the relevant community; whether the information is more valuable by virtue of not being generally known; what efforts were made to keep it secret; and whether those efforts were reasonable. *Id.*

In sum, Calderon has failed to show the absence of a genuine issue of material fact regarding Plaintiff's misappropriation claim.  The record presents questions regarding Plaintiff's efforts to protect company information, Plaintiff's employees were precluded from discussing certain work related matters amongst

---

"[t]his case, in contrast [to *IKON*], involves information that would take considerable time and effort to obtain." *Id.*

FINDINGS AND RECOMMENDATION    20

themselves.[5]  It also seems evident that Plaintiff expended considerable time, effort, and expense developing a customer base in Latin America.  Thus, Plaintiff has put forth sufficient evidence from which a reasonable jury could find that Calderon misappropriated trade secrets.

### C.   Intentional Interference With Economic Relations

Calderon next contends that Plaintiff's intentional interference with economic relations claim is legally insufficient.[6]  Plaintiff has conceded that Calderon was not restricted from lawfully competing with their business.  Calderon claims that is precisely what he intended to do by forming a Florida corporation.  However, Calderon argues that, since he never actually engaged in any competition with Plaintiff and never sold any product to their customers or induced them to take their business to a different supplier, Plaintiff is unable to prove that it has been damaged.  Calderon goes on to proclaim that, although Plaintiff had a pre-existing business relationship with the three vendors he discussed with Castro, Plaintiff has produced no evidence that these vendors ceased doing business with Plaintiff or did anything to their detriment.

In order to state a prima facie intentional interference with economic relations claim, a plaintiff must plead and prove the

---

[5] Work related matters could not be discussed with another employee unless they had a specific business reason to know or have access to such information.  (Aff. Dennis Stock (doc. #80-1) Ex. 1 at 1-2.)

[6] Aside from setting forth the common law elements of an intentional interference with economic relations claim, Calderon has cited no authorities in support of his position.

following elements: "(1) the existence of a business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished by improper means or for an improper purpose; (5) a casual effect between the interference and the damage to the economic relationship; and (6) actual damages." *Servs. Employees Intern. v. Portland Habilitation Ctr., Inc.,* 216 Or. App. 492, 496 (2007) (citing *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995)).

Here, Calderon's arguments focus on three vendors, EICO, Metaltec, and Dichtomatik; however, Calderon fails to recognize that Castro was Plaintiff's customer in Peru as well. (Aff. Dennis Stock (doc. #80-1) ¶ 8.) Calderon discussed forming a competing business with Castro during the course of his employment with Plaintiff. Calderon improperly disclosed privileged company information with Castro. He was fired on July 8, 2009, and on July 14, 2009, Castro called Plaintiff and cancelled all back orders and placed orders. (*Id*. ¶ 9.) On July 22, 2009, Calderon and Castro filed Articles for Incorporation for HSIC in Florida. (Decl. Ronald Guerra ¶ 3.) Regardless of whether HSIC became operational, it is clear that Calderon intended to form a business with Castro which deprived Plaintiff of a valuable business relationship.

Calderon's main rebuttal evidence is Castro's affidavit, which states:

> I canceled orders because those orders were very late, some of them close to a year because they come to the United States from other countries, and I was losing sales and customers because I did not have those parts on time. It was incredible how long they were taking, and there was always an excuse for not resolving the back order issue. After that, I tried to submit new orders but [Plaintiff] did not answer my e-mails.

FINDINGS AND RECOMMENDATION     22

1   (Aff. Dulia Castro (doc. #83-2) ¶ 8.)  However, Calderon's counsel

2   has given the court no indication as to who translated this

3   document, which leaves questions regarding Castro's affidavit.

4   (Aff. Dulia Castro (doc. #83-2) ¶¶ 1-8.) Additionally, the e-mail

5   conversations between Calderon and Castro seem to infer Castro may

6   have had an ulterior motive for discontinuing her business with

7   Plaintiff.  (*See* Aff. Trevor Wells (doc. #80-3) Ex. 1-4.)  Castro

8   went on to state that Plaintiff's President "was an American with

9   business etiquette . . . but at the end . . . his weaknesses come

10  out."  (*Id.* Ex. 1 at 4.)

11      In short, Plaintiff has put forth sufficient evidence to raise

12  material questions of fact on the intentional interference with

13  economic relations claim.  Calderon is not entitled to summary

14  judgment on this ground because he has failed to demonstrate the

15  absence of a genuine issue of material fact.

16      **D.  Conversion**

17      Calderon argues that his conduct, as alleged, does not

18  constitute conversion.  According to Plaintiff, during the course

19  of his employment, Calderon converted the following property for

20  his own use, and for the use of other defendants: "customer lists,

21  customer contact information, customer proprietary information,

22  vendor lists, supply lists, seal kit recipes, marketing strategies,

23  negotiating strategies, pricing information and other confidential

24  and secret company information relating to its markets, including

25  the Latin American markets."  (FAC ¶ 31.)

26      Calderon claims that the only evidence produced is that he

27  possessed a price list and discussed three of Plaintiff's vendors'

28  names with Castro, and there is no evidence of any damage accruing

FINDINGS AND RECOMMENDATION    23

to Plaintiff. In Calderon's view, even assuming that he had copied all of the information alleged, such conduct would not constitute conversion because Plaintiff would still possess and control all of the same information existing on the hard drives of their computers. Calderon claims this could not have constituted exercising dominion and control to the exclusion of Plaintiff.

In order to state a claim for conversion, the plaintiff "must establish the intentional exercise of dominion or control over a chattel that so seriously interferes with the right of another control it that the actor may justly be required to pay the full value of the chattel." *Mossberg v. Univ. of Or.*, 240 Or. App. 490, 494 (2011) (quoting *Emmert v. No Problem Harry, Inc.*, 222 Or. App. 151, 159-60 (2008)). The seriousness of the interference and the justice of requiring the actor to pay the full value, is based on an assessment of the following factors:

> (a) the extent and duration of the actor's exercise of dominion or control;
>
> (b) the actor's intent to assert a right in fact inconsistent with the other's right of control;
>
> (c) the actor's good faith;
>
> (d) the extent and duration of the resulting interference with the other's right of control;
>
> (e) the harm done to the chattel;
>
> (f) the inconvenience and expense caused to the other.

*Becker v. Pac. Forest Indus., Inc.*, 229 Or. App. 112, 116 (2009) (citing Restatement (Second) of Torts § 222A (1965); *Mustola v. Toddy*, 253 Or. 658, 664 (1969)).

Calderon emphasizes that, "[l]ooking at the actual facts presented by plaintiff, they have produced no evidence to support

FINDINGS AND RECOMMENDATION    24

the inference that the price list on [his] laptop came from plaintiff's records–especially in light of [his] evidence that it came from Marco Saavedra." (Reply Supp. Summ. J. at 10.) As to the vendors' names, Calderon again argues they are widely known in the industry, which "does not even approach satisfying the elements of the tort of conversion." (*Id.*)

On this record, I find that Calderon did not exercise such control over Plaintiff's property as to justify the imposition of a force sale upon Calderon. I recommend Calderon be granted summary judgment on the conversion claim.

**E.   Breach of Fiduciary Duty**

Finally, Calderon claims that Plaintiff's breach of fiduciary duty claim should be dismissed. Calderon's entire argument is as follows:

> While breach of a fiduciary duty may relate directly to a claim for relief such as conversion (where there is a fiduciary relationship between the parties); professional malpractice; violation of a non-competition agreement; or misappropriation of trade secrets; we do not believe that it constitutes an independent ground for relief. It is not based on the law of contract or of torts and there is no statutory duty of which we are aware. Plaintiff has failed to allege a viable claim for relief, and it should be dismissed.

(Reply Supp. Summ. J. at 11.)

Plaintiff alleges that "Calderon owed [them] an implied and express duty to keep [their] customer lists, customer contact information, customer proprietary information, vendor lists, supply lists, seal kit recipes, marketing strategies, negotiating strategies, pricing information and other confidential and secret information relating to its Latin American markets confidential and not to reveal them to other defendants." (FAC ¶ 34.)

FINDINGS AND RECOMMENDATION    25

1    In *Erickson v. Christenson,* 99 Or. App. 104 (1989), the
2  plaintiff brought a claim for breach of fiduciary duty, which
3  Oregon courts treat as a claim for a breach of a confidential
4  relationship. *Erickson*, 99 Or. App. at 106. *Erickson* went on to
5  state that, "[a]ccepting the allegations as true, the harm to
6  plaintiff stemmed from [defendant]'s misuse of his position of
7  trust . . . Plaintiff has stated a claim." *Id.* at 107. Thus, a
8  breach of a fiduciary duty may constitute an independent theory for
9  relief in Oregon. Moreover, given the claims which survive this
10 motion, the presence of these allegations does no harm to
11 preparation for and trial of the case. Accordingly, Calderon is
12 not entitled to summary judgement on this theory.

13 **III.** **Plaintiff's Motions to Strike**

14   Plaintiff moves to strike Calderon's reply brief because it
15 raises new arguments and presents new evidence not raised and
16 pleaded in his initial motion for summary judgment. Plaintiff has
17 also moved to strike the declaration of Calderon's counsel, Roger
18 Hennagin, in response to Plaintiff's sur-reply on the grounds that
19 the declaration is not based upon Mr. Hennigan's personal knowledge
20 and contains inadmissible hearsay.

21   While Plaintiff's arguments are sound, the court need not
22 address the motions to strike since they have been rendered moot by
23 the court's decision to deny Calderon's motion for summary
24 judgment. In *Jachetta*, the Ninth Circuit recognized that the
25 plaintiff had waived any argument raised for the first time in his
26 reply brief, but they decided to render a disposition because, in
27 any event, the plaintiff's arguments were unpersuasive. *Jachetta*,
28 2011 WL 3250450, at *11. Similarly, in this case, the court

proceeded on the merits and determined that Calderon's arguments were unpersuasive.  The sole exception being the motion against the claim for conversion, which I recommend be granted because Plaintiff did not establish Calderon's control to their exclusion and not because of an affidavit.  Thus, striking Calderon's reply brief and Roger Hennagin's declaration is unnecessary.

**Conclusion**

For the reasons stated above, Calderon's motion for summary judgment [75] should be GRANTED in part and DENIED in part. Plaintiff's motion [90] to strike Calderon's reply in support of summary judgment and Plaintiff's motion [93] to strike the declaration of Roger Hennagin should be denied as moot.

**Scheduling Order**

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due October 17, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.  If objections are filed, then a response is due November 3, 2011.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 29th day of September, 2011.

/s/ Dennis J. Hubel

Dennis James Hubel
United States Magistrate Judge

FINDINGS AND RECOMMENDATION      27